Cases 22-1740 and 22-1764 Raymond McDowell et al. versus Livonia Hotel Business Inc et al. Argument not to exceed 15 minutes per side. Counseling may proceed for the appellant. Good morning. Good morning, Your Honors. Drew Broaddus for the defendants. Appellants and cross-appellates. And as you will recall, the main issue in this appeal is whether Michigan's fair share liability statutes as part of its 1995 tort reform legislation was correctly applied in this diversity action. St. Thomas Aquinas wrote that a little error in the beginning of a thing leads to a great one in the end. Now, whether plaintiffs filing this suit together was an error, I won't say, but it certainly was odd. And it was the monkey wrench that I think kind of was thrown into these proceedings that put us in a place where the trial judge was unable to find precedent for a plaintiff's fault being applied against a co-plaintiff. They simply don't file suit together generally when they're in a situation where one plaintiff clearly has more fault than the other, as we had here. But that doesn't mean we lose. The lack of precedent, I think, falls by the wayside when you look at the plain language of the statute. Clearly, all actors' fault is supposed to be allocated, whether they were sued or whether they could have been sued, including a plaintiff. Suppose we agree with you. You still have the independent hurdle of the decision on the post-trial motions suggesting that you didn't adequately put this in issue because you didn't raise jury instructions that would have allowed the jury to determine whether McDowell breached a duty to Dorsey. So how would you respond to that forfeiture argument? I strongly disagree with that because what the record demonstrates is that the trial judge was still entertaining arguments about how the jury was going to be instructed, even into trial. And there was this discussion that trial counsel attempted to memorialize. There was an off-the-record discussion that he memorialized in his post-trial motion. In the middle of trial, where the court said, let's hammer out these jury instructions. It was still an open question at that point. We proposed instructions that would have reflected what we were asking for. There was this agreement. The judges were on the record. Off the record, seemingly... Did your proposed jury instructions even have anything on this? Wouldn't they have been facially inadequate? Well, no. What we proposed would have specifically said, would have specifically called for the jury. And this was set forth in the record, ECF 101. It's on pages 12 to 13 of my initial brief. The jury would have been asked, was plaintiff Raymond McDowell negligent? And the next question would have been, was plaintiff Raymond McDowell's negligence a proximate cause of Dorsey's injury? Well, that's the verdict form. That's not an instruction to the jury. So the jury would have had to find, first of all, duty, which is a question of law in Michigan. So you never ask for a ruling on the question, probably because you didn't ever try to get an instruction, right? So there would have had to be a duty, breach, proximate cause. Well, we couldn't get the instruction in part because we were rebuffed by our efforts to get it. On the last day of trial, or the day before the last day of trial. So what did you do to put this in motion from the beginning? I know you raised the affirmative defense. And then what? Well, we had this discussion during trial about what the verdict form was going to say, which at that point dictated the instructions. If it wasn't going to be in the form, there wasn't going to be an instruction. But the judge didn't rule on that until the day before. It's like a four or five-day trial, and she didn't make a ruling on that until the end of the day before, or maybe the last day of trial or the penultimate day of trial. But it's before the jury's instructed. Well, sure, but you need to, like, did your opening argument tell the jury that this was a finger-pointing case, that you were going to ask them to find that McDowell had a duty to Dorsey and breach that duty? Was that in your opening argument? I don't know that it was spelled out that way, but certainly McDowell's responsibility for this was a major theme at trial. I agree with that. I agree that you made it clear that McDowell breached some duty, but to himself, to a plaintiff? Certainly to himself. Every actor has a duty to themselves, and that's part of their cross-peel argument. But your argument post-trial was that McDowell's duty to Dorsey was employer-based, and Judge Larson suggests that duty is a question of law. It seems to me you had some type of duty yourself to say to the district court, there's this duty out here, I think this is the law in Michigan, I think you need to find this duty, and then you need to instruct the jury on whether it's been breached. But as far as I can tell, none of that happened, not even a theory of duty until the post-trial motions. Well, I think the critical issue here that demonstrates the jury understood our point on this was the question that they asked, is McDowell's negligence to be applied to Dorsey's recovery? I think that's the silver bullet here that explains what happened here. I don't think a jury can question, can preserve an argument that has been forfeited. No, but I think it demonstrates that it wasn't forfeited, that this was a trial theme. Well, suppose we think that legal rule should be, if you're going to raise this type of other person's fault, then you need to go through the elements, and under Michigan law there is a duty requirement, and it has to be decided by the court, not by a jury. So you should, prior to trial, let the court know that this is going to be your argument and that the court can decide one way or the other, yes, there is this duty, that can be appealed after the fact if you disagree with the court's ruling, but to not actually have ever told the court about the fact that there kind of is this duty between the two co-plaintiffs strikes me as putting the court in a very difficult situation. It's like the court has to decide on the last day of trial what the law is. Well, there was extensive arguments about this. We went on the record a few times about whether this was going to be. Was there any briefing? There was some. I don't know that this issue of duty was briefed until post-judgment, but I don't know that it was disputed either. That explains partially why it was brought up for the first time in our, arguably for the first time in our post-trial motion. But even then, I mean, the post-trial motion, you know, those court rules exist for a reason. I mean, I know there's not a lot of situations where issues are decided. It's a differential standard of review, but if this was a, you know, I think this is a situation that was really called out for, you know, correcting this oversight. And there was no, I mean, I think it's clear under Michigan law there was a duty out as a co-employer, as a reasonable person once you get that call in the middle of the night that basically says, I'm coming to get you, like Rambo II, and he does nothing. I don't think there's really a dispute that the duty exists. So, I mean, if it was not raised properly earlier, it certainly was post-verdict. Can I ask you about your remedy? So you've only asked that the judgment be amended, right? So that's the only claim you have is that the judgment be amended so that Mr. Dorsey's recovery would be reduced by 80 percent. Is there a Seventh Amendment problem with that? I don't think so. Why not? Because the jury made it. So we'd have to take, I think what you're going to say is the jury asked this question, and that we should think of as the jury's verdict? Do you have any authority for that? The jury made a finding that the hospital was 20 percent liable for both injuries. They said that the hotel has the same liability across the board. They asked that in a question to the judge. Right. But they told the judge we found that. I mean, that's a factual finding. They said, yeah, you're right that they said we think. We think, and therefore what do we do? Is there any case in which, you know, so the jury's verdict form is the verdict form in which a court has said, huh, this question from the jury probably reflects their actual verdict if they had been properly instructed? I mean, I couldn't find one. Yeah, I'm not claiming there is, but I do think that there's broad authority. The trial court has broad authority under the abuse of discretion standard. That's something that you could have reached. I mean, unless you're up against a Seventh Amendment problem, right? So why isn't your remedy a new trial at which the jury would be properly instructed under Michigan law about fair share liability? Well, and as you alluded to, I think the question, it would have been a, it would be a tremendous waste of resources to repeat all this when we have that statement in the record that they did make this finding. Yeah, it's just, I mean, it's a question. I just, I don't, I don't know how you think it's a finding. I mean, unless you have a case that says we can consider a question from a jury as a finding, that seems. So then I'm wondering, well, your remedy seems like a new trial. We haven't asked for that. We didn't ask for that in the trial court. And I maintain that I think that would be a tremendous waste of resources based on what the jury said. What is it that, you said McDowell, he was told, I'm coming to get you Rambo style. Was that the phone call to that? That was the phone call. And who testified to that? Well, he testified, McDowell acknowledged it in his deposition. He denied it at trial. He was impeached on that point. The jury, based on the 80% finding of fault, presumably accepted his deposition testimony over his trial testimony. So that's your key theory of comparative fault? That was persuaded, that was what the jury was persuaded by. So there were some other things, but that was the big one. That was, I guess, the last clear chance, so to speak, even though that's a loaded term. I was thinking, I don't know if you were the trial lawyer, but I was thinking he did a pretty good job making it 80-20. Because as a juror, I would have been a little upset at the hotel for letting someone in my room in the middle of the night. And I guess you think the key counter to that was the phone call. Yes, and the entire lead up to that, there was no real, there was some odd things in terms of having him come over after they're done and he sees a large amount of money in the room. He's shown a large amount of money by McDowell. It's not negligence to show you have money. No, but you look at the entire situation. And then the last moment is when he gets the call and ignores it and goes back to bed. Okay, well, you'll get your full rebuttal. We'll hear the other side's perspective. Thank you. Mr. Dadd? Thank you. May it please this Court, Issa Dadd on behalf of the plaintiffs, appellee, cross-appellant. I'd like to reserve five minutes for my rebuttal, I believe. I think we're just going to go, just march ahead. Let's do that. Okay, so this case is about negligence to the hotel. The employee at the counter gives away a key to the room at 6 o'clock in the morning. The defendants throughout trial didn't put this in their opening. They formulated this and in their closing it came about what their defense was at trial. That the parties were negligent for hiring this individual. Now, in Michigan, there's no duty to foresee criminal conduct whatsoever. And the exceptions are, the cases that I found, when something was potentially foreseeable, there was some type of crime already in place. And, for example... What about the phone call? The phone call, exactly. In the deposition, Mr. McDowell said he got a call from Anthony Fowler Mitchell and said, my girl put me out, can I come stay with you guys? My client said, no, you got paid, get your own room. There was no threat made. And that was the testimony in the deposition and at trial. The transcript reads in one line that he called and threatened me, and then two lines later he called and he was telling me. So, we've got a jury verdict, so we've got to read this in the direction of threatening, right? Yes. So, why... That seems a little unusual to just say, well, I'm tired, I'll go back to bed and think about it tomorrow. There was, on direct and cross-examination, Mr. McDowell about that phone call. He said exactly what happened. It was a very short call. He called me and said, my girl put me out, can I come stay with you guys? There was no threat there. If we think that the jury has to find, based on the one line, that there was a threat, do you admit that then he was negligent? No. Why? Because that alone, when you're woken up in the middle of the night, and you get a call saying, can I come stay with you guys? And the answer is no, you can't. But he's asking, you're answering the easier question. Answer the question, what if it's a threat? Is there a case that says it's not negligent? I have not found a case that said it is or it is not negligent if someone calls you and threatens you. The truth of the matter is, he's in a hotel room where the door is locked, and if someone calls you and says, hey, I'm going to come kick your butt, I'm coming over right now, and you believe your door is locked and secured... Just try it. They'll never give out the key. They'll never give out the key. Is that how it works? He's not going to let them in. He's not going to open up the door to let them in. No. We saw what happened. Right. And unbeknownst, the clerk gave a key to room 208, which allowed him to get in. Your negligence point isn't about the threat. It's not negligence to trust the hotel to follow the rules. That's your real theory. That is. In the example, in their opening statement, they gave a list of things that Mr. McDowell did that limits to his negligence in saying, oh, he hired somebody from Craigslist. He paid him with a wad of cash, and paying somebody with a wad of cash is not there. You take the same set of facts with a different set of people. You've got a female moving out of her apartment. She broke up with her boyfriend. Call somebody from Craigslist.  He don't have a driver's license. Can you drive the truck over here? I'm going to room 208. I'm going to pay you when you get there. You pay him. He leaves. He comes back at 630 in the morning, gets a key, breaks in, rapes, kills her, does whatever he wants. Did she have anything negligent to do? He called her up and said, hey, I ain't got a place to stay. Can I please stay with you? I saw you had two beds. No, you can't. So there's no duty to foresee criminal conduct. And if someone threatens you and you don't see, his threat was he wanted to come stay in the room with him. If we take it as a threat, what he said was he wanted to come stay in the room with him. That's not foreseeable criminal acts of a third party that brings rise to a duty. What was the time in between when he originally knocked and when he came back and kicked in the door? Is there any argument that he had a duty? So he had made a threat, and then he knocked, demanded entrance. Was there any duty at that point to call the police? Or maybe the front desk. The law doesn't impose a duty to call the front desk or call the police when someone knocks on your door. The call came in approximately 4.30 a.m. They knocked at approximately 6.20 a.m. He came back with the key approximately 6.30 a.m. Is what the timing reveals. And at that time, they were woken up at 6.20 a.m. And they said, you know what, this is all on the record, you know what, it's 6.30, let's just pack up our stuff and let's just head out of here. What did the trial testimony say with respect to what he had told the hotel clerk about giving some third party a key? Oh, they never, the plaintiffs, McDowell and Dorsey, never gave the instruction to the hotel clerk. The hotel clerk made all this up after hindsight of listening to... So this is tricky because you're both appealing and we have to take the verdict and the light most favorable to what the jury could have found. So if there is any evidence that your client was negligent, I think we would have to take the hotel clerk's testimony as true. And it strikes me that that would be at least fairly negligent to say give a third party a key. The clerk's testimony was very self-serving. And the hotel policy was if you're going to leave a key for somebody, you give the name. He said he was never given a name. He said that when they come in, you've got to ask for the name of the person, make sure it's in the system. It wasn't in the system. Then you can always call the room and say, can I give a key to this person? The interaction was caught on video, it was 40 seconds long. My clients testified that they had one job in Michigan and they only needed this Fowler Mitchell for the one job for a couple hours in Livonia, Michigan. I'm sorry, Farmington Hills, Michigan. And then he was paid and he was done. And the fact that this was Super Bowl Saturday night going to Super Bowl Sunday. Their plans were check out of the hotel room and go to their friend's house in Detroit and watch the Super Bowl. There was no more work done. And there was no manifest that said there was another delivery in Michigan. They didn't need this guy's help for anything. And that goes to show that the clerk made this up. He was in the lobby the entire time the police showed up and they were questioning the two plaintiffs, Dorsey and McDowell. And they said, yeah, we hired this guy. And he did a job for us. And the clerk is walking in the background listening to all of this stuff. And the fact of the matter is, he never told the police, oh, by the way, I gave them a key to their same exact room. It wasn't until the police got the video and questioned him that he said, oh, I'm going to start lying all the time now. And then... But still, this is fighting a jury verdict. Don't, we have to, you could tell the jury he was lying, but the jury found your client 80% liable. And that could have been a big part of the finding, that they accepted the notion that he said something to the clerk. And that ruling was errored because there's no duty to foresee criminal conduct. And so, even if you told them... Even if you told them, give the key to this guy who's going to come by? I'm sorry, that's not what I said. When there's no duty to foresee criminal conduct. And you assume that people are going to follow the law and not going to commit a crime against you. The clerk gave him a key without asking for ID, without verifying or calling the room. And his story was, I was doing it for my own safety. And then for the safety of the hotel and the other guests, which made no sense at all. When the jury... But there's also testimony, as Judge Murphy keeps pointing out, that the clerk said that your client instructed him to give the key to this guy who's going to come by in the morning. Now, true, he didn't check the name. But a guy shows up in the morning and says, hey, give me a key to this room. I mean, maybe he didn't follow hotel procedure. But, I mean, if we have to consider the verdict or the facts of the light most favorable to the verdict, we can't fight that, right? Yes. And also, the clerk also said he didn't give him a working key to room 208. And he said that because he felt something wasn't right. And he said he gave him a key just to get him out of the lobby to go to the room. And if he was allowed to let in, he would knock on the door and they would let him in. Yeah, and so maybe the jury believed that. So they found it like, you know, only 20% the hotel's fault. And with regards to Dorsey... The door was kicked down, right? The testimony was, the door came open, it was stopped at the chain, and then it came back, and then it was forced to use to break the chain. Yes, so you wouldn't need that if there was a key. The key was able to unlock the main locking mechanism. And then the door came open, stopped at the chain. If you didn't have a key, you'd have to lock the deadbolt and the metal and the mesh. And these were very strong doors. I believe the officer testified that they had a hard... The key doesn't matter. If they got the chain on, the key doesn't matter at all. They were going to kick that door down no matter what. Was there evidence that the door was so strong you couldn't kick it down unless you had first exposed the lock and just had the chain? The officer testified that they were there for some incident prior to, and they couldn't get into a room, and they're very secured. And they had an incident, and I don't recall how soon it was, but one of the officers testified that those doors are very secured. And the officer, and it came out in the testimony, that the only reason the suit was brought is because the cops told the plaintiffs that the clerk gave Mr. McDowell, Mr. Anthony Fowler Mitchell, a key and said, you need to go see a lawyer. Because there's no way that person would have gotten in that room by kicking that door down. Those doors are very secure. The police couldn't get into a room one time is what the information was. And so the fact that the key was used to get into the door, it was the negligence lies. And that was 100% at fault for Dorsey. And if you backtrack from there, the jury believed that the employee in the hotel was 100% negligent for Dorsey. And then you backtrack to McDowell and say that he was 80% at fault, and what the defendants claim... So if we have, I mean, I hear you saying we have inconsistent verdicts here. And so what's the remedy for inconsistent verdicts? It's a new trial, right? That would be one remedy, yes. Yeah, you both seem, I mean, I know that's not what you want, but it seems like the remedy for the thing you're claiming is a new trial, and the remedy for the thing he's claiming is a new trial. What we're claiming is that there's no duty. Therefore, there can be no negligence on McDowell. And therefore, if there's no duty, which is a matter of law... Criminal activity. Correct. But why is there a duty on the hotel front desk to foresee criminal activity? Because giving a key to a secure room in the middle of the night without... Except that there's testimony that your client said, please give a key to this guy who's going to come by. The... I want to make sure I understood the question. Giving the key was the proximate cause for the injuries my clients received. But for giving this key, the injuries wouldn't have happened. And they wouldn't have been able to get into the room. They could have waited until they exited the room. They could have waited. They could have done other things. But the fact that the key, that the hotel was even 1% negligent, that they gave him the key to allow Fowler Mitchell and his other two assailants into the room, it caused all the damages. But my question goes back to the duty point. If there's no duty to foresee criminal activity, and the hotel clerk has been told, I know you dispute this, but there was testimony to this effect, please give a key. This guy is going to come by in the morning. Please give him a key. Why would the hotel desk, front desk, assume, ah, that guy is probably going to commit a crime? No, no duty to foresee criminal activity. Same thing for your client. The duty gives and takes. Yes. Now, the testimony in light of the clerk's testimony was that he felt something was off. He knew something was right. This is a high-crime area. And the first issue with the hotel is the safety of the guests and himself. And then it changed. The first thing is the safety for himself in the lobby because, you know, there's just this glass and it was wide open. And so he puts it out there. It's foreseeable that if you give a key to somebody that's not supposed to be in a room, something bad is going to happen. That is foreseeability that's allowed in the situation of the innkeeper where someone's sleeping at 630 in the morning and you give a key to somebody that's not supposed to be in there, something bad is going to happen. Because if the room was empty, that's one thing. But the room was being occupied. In the videos and the testimony and the evidence at trial, you could see the semi-truck was still parked outside the window where the clerk was at. Out of curiosity, there's appeals, there's cross appeals. Which one of you has the most to lose by an affirmance? By an affirmance? In other words... And across the board. Across the board affirmance. Which one of you is the least happy? Which one of you is the most happy? I guess that's a tricky question. So Dorsey... It shouldn't be. I'm sorry. Dorsey would lose approximately $140,000. And McDowell has the opportunity to gain $116,000. So that's where it's at. A new trial would obviously start over and allow the court to have to make a ruling on is this a duty that they can play to the jury as an affirmative defense that they never pled the first time around. So it came in the midst of trial. Because they never pled an opening. They never... What's the answer? What's the answer? Are you the most happy or the least happy by an affirmance? Dorsey would have the most to lose. You and both your clients, right? Yes. It's a team. Yes. It's that team versus the hotel team. My team has the most to lose. Okay. Can I ask, if you don't mind? Go ahead. So I'm struggling with what to do with the motion to strike. Part of me thinks you had a duty to respond to the appellant's arguments in your second brief. Our usual rule is where you don't raise arguments at the appropriate time, we find those arguments forfeited. And so you make pretty compelling arguments in your fourth brief about how the hotel did not adequately preserve the duty between McDowell and Dorsey. The problem with that is that didn't give them an opportunity to reply, and it belonged in the second brief. So my instinct would be you have forfeited, you have yourself forfeited any forfeiture arguments because you raised them too late. And so why would that chain of reasoning be wrong? Striking is an extreme route. It wouldn't be as striking. We'll accept the brief. We'll just say that you forfeited all of the new arguments that you raised in that brief that you should have raised in your second brief, which would include the arguments about the hotel did not adequately raise the duty point between McDowell and Dorsey. It was raised in the post-trial motions, and my position was that if they wanted to, they could have filed a motion to request a SIR reply to those issues back in March, and they didn't do that. The issues of statutory construction that we raised and how it goes and the other issues that we raised in there were all well known to the defendants. And we would ask that you don't strike it. You know, maybe give them an opportunity to rebut those things, you know, with a SIR reply. But it's to your advantage to follow the rules in the future. Yeah. Okay. Well, let's hear rebuttal. Thank you very much. Thank you, judges. So we've heard a lot about foreseeability, and the general principle under Michigan and most states' laws is criminal acts are not foreseeable unless there's no duty to foresee criminal acts unless there are specific events that make them foreseeable. And that's the gist of the jury's finding, and that deals with, I think, the first three. Well, to the first three, the first one's just a procedural objection, but of the cross-appeal arguments that I really haven't dealt with. So it sounds like the court understands that issue as McDowell's duty with regard to McDowell. I don't think that's really controversial, and I think it was preserved all along. There was actually a jury, a verdict form proposed by the plaintiff well in advance of trial that acknowledged that each plaintiff's own comparative negligence would be applied to them. So there was no surprise there, and the law is settled. I asked just briefly about Dorsey's future damages. So the district court initially limited any future damages to three years, and then after the fact eliminated the jury award for those three years on the basis that there was no evidence that Mr. Dorsey would live for three years. And it strikes me that that's quite counterintuitive to me, that somebody in their 40s would need an expert to confirm that they would live for three years. So I would think that I would be able to get up on the stand and say, yeah, I'm healthy, I'm 40, I'm not going to die in the next three years. So why would you take that? As I understand your argument, is your argument that you need an expert for somebody who's in their 40s to suggest that they will live for three more years? Well, and just being alive doesn't necessarily establish the damages. But I thought that was the basis for her ruling that it was speculative, whereas he testified fulsomely about the PTSD that he was suffering. Well, there's two things here. One is, and it may sound like a form over substance objection, but you have to establish the life expectancy with some proof, and they didn't even ask the court to do that. Yeah, so I thought that was, so maybe the idea should have been the court, because you have a duty to establish life expectancy, the court at the initial stage should have eliminated future damages. But it strikes me as strange to think that you would need an expert for just a three-year period. Well, I don't know that they needed, but they needed something more than they had, I think is the bottom line. So is there no testimony, did the trial transcript get into this at all? Was there any testimony from Dorsey that he would live for three years? Again, we can assume he's going to live for three years. I don't think anyone disputes that if mortality tables were proffered, they would have shown that he lived for three years. The problem is they simply weren't. So under your view, you at least have a duty to introduce basic. Right. But isn't it in some respects a common sense matter? I thought we'd leave common sense stuff to the jury. Well. It doesn't become a common sense matter. I certainly, I'm with you, the farther away you get. Right. That it's like how long is somebody going to live? You probably need experts. But I thought the court took care of that by limiting any potential damages to three years. But even in those three years, we're talking about non-economic damages. There were no proofs in that regard for Dorsey. He just kind of said, you know, I have non-economic damages. And, again, this is a discretionary call by the trial judge. It's not necessarily a discretionary call. It's a Rule 50. This is Rule 50, not Rule 59, wasn't it? We review Rule 50 things de novo. Judgment as a matter of law, not judgment for a new trial. Okay. I accept that. But I think just when you look at the proofs, I mean, what non-economic damages did he incur in those three years, even if we set aside the failures? Well, he said his PTSD was going to continue. I guess maybe your point would be you need a doctor to say that it would continue. I guess you're getting into medicine there, I suppose. You are. But he did say he had been diagnosed. He was going to the VA and suggested it would continue. I mean, we also had VA records from a year and a half after the fact that said he was not feeling those things anymore, which kind of goes towards there not being that element of damages. So I think there really was. And didn't they object to the introduction of the mortality tables? I thought that the plaintiffs objected to that, to the introduction of the mortality tables. I don't know why they would object to that. They should be the ones offering that, in our view. So I'm not clear on. I thought that they did not want to introduce the mortality tables because then that would have opened that up to questioning about whether they were actually accurate with respect to these plaintiffs who may have had some lifestyle issues. That may have been discussed. I'm not entirely clear why they weren't produced. I just know that ultimately they weren't. All right. Thank you, Your Honors. Thank you very much. We really appreciate your briefs and arguments. Good question. Judge Larson wondered, this was a little bit behind my question, to Mr. Haddad, who loses by an affirmance, which still isn't 100% obvious to me, particularly when you remember sending it back comes with risk. There's nothing guaranteed in a second trial. Have you guys used our excellent mediation services? We worked with them. We spent most of the day on the phone. Well, listen, it's obviously voluntary, and just remember there's no guarantees of victory in this setting. In other words, not just that you might not win, but even if you win, there's still a lot of risk that occurs when you go back to the trial. So just keep that in mind. But we won't release anything, and we'll wait at least seven days on the assumption that you'll think about trying some more, and that's your call. But it is a very good group, and they have a lot of, no one claims to be a happy customer from mediation, but often a lot of happy clients. Thank you.  Thank you. Okay, the case will be submitted.